Angelo **CANTONE**, Petitioner,

v.

**SUPERINTENDENT, GREEN HAVEN CORRECTIONAL FACILITY, et al.,** Respondents.

**No. 84 Civ. 1314 (WK).**

United States District Court, S.D. New York.

June 18, 1984.

Angelo Cantone, pro se.

Lawrence J. Schwarz, Asst. Dist. Atty., County of Nassau, Mineola, N.Y., for respondents.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Petitioner, acting *pro se*,[1] has brought this action for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. His central claim is that the State in violation of *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 and *Mooney v. Holohan* (1935) 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 failed to furnish him prior to or during his trial in the Supreme Court, Nassau County, with certain potentially exculpatory material which had been requested by his counsel. For the reasons detailed below, we grant the petition.[2]

---

1. Petitioner states in his "Traverse to the Return" that he received "the assistance of prison inmate Alfred Mancuso" in preparing that document. This does not, of course, alter his *pro se* status.

2. Petitioner has also asserted, as a secondary contention, that error of Constitutional dimension was committed by the trial court in denying the motion for a mistrial made by him during the course of his trial. Since we agree with petitioner's first contention, we need not here discuss that issue. We note, however, that

it, like petitioner's main contention, has been fully considered by the New York courts and is thus properly before us. Petitioner was convicted and sentenced on December 4, 1978. Petitioner's appeal to the Appellate Division, Second Department, which raised—among other issues—his *Brady* contention, was dismissed and his conviction affirmed without opinion by a unanimous court on January 14, 1980. *People v. Cantone* (2d Dep't 1980) 73 A.D.2d 936, 423 N.Y.S.2d 507. Leave to appeal to the New York State Court of Appeals was denied. *People v.*

## INTRODUCTION

Petitioner and two others, Alfred Gourdet and Michael Quaranta, were indicted for possession and sale of cocaine. The State's principal witness against all three was Carliese Gordon, a Federal Agent who, acting in an undercover capacity, had purchased heroin from them at Gourdet's residence. On direct examination, Agent Gordon gave a detailed account of his dealings with the defendants, clearly indicating the role each played in the transaction and identifying petitioner as the source of the narcotics. On cross-examination by petitioner's counsel, it was developed that while the transaction at issue had constituted Agent Gordon's only contact with petitioner and Quaranta, the agent had developed some sort of ongoing relationship with Gourdet which had involved at least one prior sale of cocaine. Faced with this evidence of prior crime not mentioned in the indictment, Gourdet moved for and was granted a mistrial and severance. After similar motions by petitioner and Quaranta had been denied, the case proceeded as to those defendants.

Petitioner had stated in his opening argument that he had been merely a bystander at a deal pre-arranged by, and transacted solely between, Gourdet and Agent Gordon. Although, as above noted, Agent Gordon's testimony was legally sufficient to overcome such a suggested defense, the prosecution must have concluded that something was lacking from the jury's point of view: it entered into a plea bargain with Gourdet, who proceeded to testify and corroborate Agent Gordon's version of the events. It thus became vital that petitioner cast doubt—if he could—upon the credibility of this corroborating witness.

A circumstance of which the Assistant District Attorney trying the case was acutely aware, but which was not disclosed to the defense, was that the prosecution had information from a reliable informant that Gourdet, the State's newly-produced witness, had in fact plotted to murder the Federal Agent who had testified against him and his co-defendants, and whose testimony he had just corroborated.

On October 14, 1977, approximately one year prior to petitioner's trial,[3] petitioner's counsel had filed an "Omnibus Motion" for various forms of pretrial relief and discovery, which motion contained the following requests:

5. [For an Order] [d]irecting the District Attorney to disclose to defendant at least sixty (60) days before trial,

\*　　\*　　\*　　\*　　:　　\*

(c) Every fact, circumstance, lead or evidence which the District Attorney may know or can determine from an examination of the various investigative agencies of the government which may, might or could assist him in the preparation of his defense.

\*　　\*　　\*　　\*　　\*　　\*

9. [For an Order] [p]ursuant to CPL § 240.20(3), requiring the People to state whether or not defendant Gourdet or defendant Quaranta made any statement at all, whether oral or written, to any public servant engaged in law enforcement activity *or to a person acting under his direction or in cooperation with him;* and if any such statement was made, to reveal the exact contents of any such statement, and to supply any paper or document made by any public servant or

*Cantone* (1980) 49 N.Y.2d 892, 427 N.Y.S.2d 1029, 405 N.E.2d 239. Petitioner subsequently filed a *pro se* application pursuant to § 440.10 of the New York State Criminal Procedure Law, which application raised—among other issues—the contention raised here with respect to his motion for a mistrial. This application was denied in an (apparently unpublished) opinion dated December 18, 1980, in which the Court held that the mistrial issue should have been raised on appeal and could not be considered for the first time on such a motion. Leave to

appeal from this decision was denied on September 22, 1981; reargument was denied on December 8, 1981. Petitioner has thus fully exhausted his state remedies for the errors alleged in the instant petition.

**3.** Respondents state that this motion was filed on the eve of trial. This is incorrect: the motion was filed in October *1977,* and the trial commenced in October *1978.*

his agent, in which any such statement is set forth or referred to in any way. (Emphasis supplied.)

At the commencement of the joint trial of petitioner and his two co-defendants one year later, the prosecution moved to close the courtroom during the testimony of Agent Gordon, its first and main witness. At a hearing at which counsel for all three defendants were present, Agent Gordon testified that he had been told, by confidential informants and certain police officers, that a number of "contracts" had been taken out on his life—i.e., that rewards had been offered to anyone who would kill him. Transcript of open hearing of October 6, 1978 ("Tr.") at 9, 16. Defense counsel and the Assistant District Attorney agreed that the origin of these "contracts" would not be disclosed at the open hearing. Tr. at 16–17. After the motion had proceeded for what appears to us to have been several minutes, counsel for petitioner stated his understanding that these "contracts" were not alleged to be in any way connected to the trial at hand. Tr. at 26. At this statement, the Assistant District Attorney for the first time indicated that such was not the case, and that she did indeed allege a connection between petitioner's trial and the threats on Agent Gordon's life, Tr. at 27. Agent Gordon testified that he had learned "from a confidential informant . . . whose reliability has been tested before . . . that has been involved with other cases before" that threats had been made on his life in connection with the case against petitioner and his co-defendants, Tr. at 30–31. Counsel for defendants did not inquire as to the source of these threats; their inquiries with respect to the confidential informant were cut short by the trial judge. Tr. at 35.

The trial judge ruled that the prosecution had made a preliminary showing of need to close the courtroom, and the hearing on the motion to close the courtroom then continued in camera, outside of the presence of petitioner, his co-defendants, and their counsel.

In the in camera proceeding, the Court read DEA memoranda concerning contracts taken out on Agent Gordon, and Agent Gordon testified briefly as to safety precautions undertaken to protect him. The informant then testified that he had learned from petitioner's co-defendant Gourdet of a contract Gourdet had taken out on Agent Gordon; and a police officer testified as to the informant's reliability and veracity over a period of four years. The trial judge then granted the motion to close the courtroom during Agent Gordon's testimony. Neither petitioner nor his counsel was informed of Gourdet's contract on Agent Gordon or of his statement to the informant. The record of the in camera hearing, sealed by order of the trial judge, has never officially been made public.

At the trial, as stated above, Agent Gordon testified against the three defendants; petitioner's counsel elicited on cross-examination the fact of his prior relationship with Gourdet; and Gourdet's motion for mistrial and severance were granted, petitioner's and Quaranta's denied.

When the trial resumed, the prosecution called Gourdet, who had pleaded guilty after having been severed and had quickly arranged a cooperation agreement (which was admitted into evidence over the objections of petitioner's counsel). Gourdet reiterated Agent Gordon's version of the events, and detailed the nature of his agreement with the prosecution. No mention was made of Gourdet's contract on Agent Gordon or of any statement Gourdet may have made to the informant.

The prosecution rested after offering several more witnesses. In their defense, petitioner and Quaranta attempted to prove that Gourdet was completely responsible for the narcotics transaction, to which they claimed to be innocent bystanders. Both were convicted.[4]

---

**4.** Quaranta's conviction was eventually reversed by the Appellate Division, which held that:

[T]he Trial Judge should have declared a mistrial following his granting of a severance to co-defendant Gourdet on the ground that

While petitioner's appeal was pending, his appellate counsel unexpectedly received from the court reporters the sealed transcript of the *in camera* motion to close the courtroom. Appellate counsel immediately applied to the court for permission to file a supplemental brief and for instructions as to how to handle the information which he had thus acquired. He was granted this permission, but was told that before he prepared his brief he should return the copy of the minutes which had been sent to him, any copies he might have made therefrom, and all copies of his notes of them. He was further instructed not to discuss the matter with petitioner and not to disclose his new-found knowledge to anyone, including petitioner; and to file the supplemental brief under seal. Petitioner's counsel complied with all these instructions. Petitioner discovered the truth about Gourdet, and the circumstances above related, only upon the unsealing of the appellate briefs after the denial of his appeal.

## DISCUSSION

The United States Supreme Court in *United States v. Agurs* (1975) 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342, identified three separate rules of law, applicable to different situations where a prosecutor has failed to disclose potentially exculpatory evidence to the defense.

In the first situation, typified by *Mooney v. Holohan*, 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791], the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury. In a series of subsequent cases, the Court has consistently held that a conviction obtained

by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.

427 U.S. at 103, 96 S.Ct. at 2397 (footnotes omitted).

The second situation, illustrated by the *Brady* case itself, is characterized by a pretrial request for specific evidence. In that case defense counsel had requested the extrajudicial statements made by Brady's accomplice, one Boblit. This Court held that the suppression of one of Boblit's statements deprived Brady of due process, noting specifically that the statement had been requested and that it was "material." A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.

427 U.S. at 104, 96 S.Ct. at 2398 (footnotes omitted).

The third situation, presented by the *Agurs* case itself, arises where neither *Mooney* nor *Brady* applies: *i.e.*, where the information not disclosed by the prosecution was not specifically requested by the defense, and does not implicate the veracity of a witness's testimony.[5] In such a situation, the Court held, the petitioner challenging a conviction must meet a higher standard than those set forth in *Mooney* and *Brady:* only "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." 427 U.S. at 112, 96 S.Ct. at 2402.

Respondents do not seriously deny either that the information withheld was poten-

Gourdet could not receive a fair trial due to the introduction of certain evidence. By allowing the trial to continue against [Quaranta], defense counsel was forced to change his trial strategy (*see People v. Baum,* 64 A.D.2d 655 [407 N.Y.S.2d 58]). The prejudice was compounded when Gourdet decided to plead guilty and appear as a witness for the prosecution. Defense counsel had little opportunity to prepare for such a surprising change-over

in events. Under these circumstances, [Quaranta] is entitled to a new trial.

*People v. Quaranta* (2d Dept.1980) 74 A.D.2d 910, 426 N.Y.S.2d 66. A motion to vacate Cantone's conviction on similar grounds was denied on December 18, 1980.

5. Contrary to respondents' characterization of *Agurs,* the information there withheld from the defense concerned the murder victim, not a witness at trial.

tially exculpatory, or that the Assistant District Attorney trying the case was under a duty to disclose it. Rather, their position appears to be that this case does not fit the specifications of *Brady* or *Mooney* and hence must be judged not by the more liberal standards of materiality specified in those cases, but by the strict *Agurs* standard. We disagree, and conclude that this case fits easily into the *Brady* mold.

While petitioner's trial counsel's Request No. 5 is admittedly broad and non-specific, Request No. 9 is precisely the sort of specific demand with which the Supreme Court dealt in *Brady*. What impressed the Court in *Brady* was that the defense had requested production of any extra-judicial statements of a particular witness. This is precisely what occurred in the case at bar. Request No. 9 demanded the production of "the exact contents" of "any statement at all, whether oral or written, [made by Gourdet] to any public servant engaged in law enforcement activity or to a person acting under his direction *or in cooperation with him.*" The information withheld was a statement, made by Gourdet, to a confidential informant, who by definition is a person acting in cooperation with a public servant engaged in law enforcement activity.[6] We do not think it of any moment that the informant may or may not have been on a particular assignment at the time the statement was made, since his cooperation was of a continuing nature. Indeed, it appears from the transcript of the *in camera* hearing, which respondents have supplied to us under seal,[7] that the conversation between Gourdet and the informant was precisely the sort which governmental entities hope and intend to encourage by hiring individuals as informants; and, further, would not have taken place had the informant not been acting covertly for the State.

Our next question is whether or not the material withheld in the instant action meet *Brady's* standard of "materiality." We unhesitatingly find that it does. In seeking to undermine Gourdet's credibility, counsel would wish to explore several areas: Gourdet's general moral character; any indication of a willingness to defy the law in his own self-interest; any motive to falsify his testimony; and his perception of the State's power to injure him if his testimony should displease it. It is apparent that the withheld information vitally affects each of these areas. The moral gap between selling cocaine and hiring someone to murder a Federal agent hardly requires comment. A jury might well consider that one who would engage in a plot to murder would be quite ready to commit perjury. The last two considerations are interrelated, and a jury would certainly be entitled to consider that a defendant faced with prosecution for attempting to murder a Federal agent would deem himself in greater peril of the State's wrath than would a cocaine dealer. In brief, petitioner's attorney was deprived of powerful material for cross-examination, and left with only the standard attack on all prosecution witnesses, to which juries readily become inured.

We therefore find that Gourdet's statement to the informant was both "material" and "might have affected the outcome of the trial," *Agurs, supra,* 427 U.S. at 104, 96 S.Ct. at 2398, thus fulfilling the *Brady* requirement.

This finding that *Brady* was violated by the State's failure to disclose to the defense Gourdet's statement to the informant is, of course, sufficient to compel us to grant the instant application. We therefore need not decide whether or not the witness Gourdet perjured himself before the jury so as to make the failure to disclose his statement to the informant a violation of *Mooney,*

6. Indeed, we are tempted to think that respondents have entirely overlooked Request No. 9, since we cannot otherwise conceive how they could in good faith contend that Gourdet's statement to the informant, which surely was startling enough to cause a prosecutor to take notice, was not the subject of any specific request.

7. We agree with respondents that portions of this transcript could still be considered sensitive in nature. Since they have not been disclosed nor the record of the *in camera* hearing unsealed, we shall not discuss them in detail.

*supra,* as well. We must note, however, that it would seem obvious on its face that no defendant represented by counsel—as Gourdet was—and faced with a possible prosecution for the attempted murder of a Federal agent, would enter into a guilty plea and cooperation agreement without at least some discussion of the prosecution's intentions with respect to such a charge (including what, if any, discussions the prosecution may have had with the relevant United States Attorney). It therefore seems highly probable that Gourdet committed significant perjury in describing his plea agreement with no reference to this subject. However, there is no evidence before us on this record to permit a finding one way or the other.

In summary, we find that the State's failure to disclose the fact that Gourdet had stated to an informant that he planned to kill Agent Gordon was in violation of *Brady v. Maryland, supra,* and perhaps also of *Mooney v. Holohan, supra,* and thus that petitioner's application for a writ of *habeas corpus* must be granted. The petitioner shall be released from custody if not afforded a new trial to commence on or before September 17, 1984.

SO ORDERED.